## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**UNITED STATES OF AMERICA,**

**v.**                                              **Case No. 3:19cr32-MCR**

**TIMOTHY J SMITH.**

_____/

## <u>ORDER</u>

Timothy Smith was charged by Superseding Indictment with computer fraud, theft of trade secrets, and extortion in relation to offshore fishing reef location coordinates.  Smith went to trial and was found guilty of theft of trade secrets and extortion but not guilty of computer fraud.  At trial, his Motion for Judgment of Acquittal made at the close of the Government's case was denied on the extortion charge but the Court took the motion under advisement on the computer fraud and theft of trade secret charges.  Smith has now filed a Post-Verdict Motion for Judgment of Acquittal and, in the Alternative, Motion for New Trial, pursuant to Federal Rules of Criminal Procedure 29 and 33, ECF No. 82. Having presided over the trial and considered the record, the Court finds the motion is due to be denied.

StrikeLines Pensacola, LLC and StrikeLines Tampa, LLC (collectively, "StrikeLines") were two Pensacola-based companies owned and operated by Travis

Griggs and Tristian Harper.[1] As part of its business, StrikeLines sold coordinates for private artificial fishing reefs in the Gulf of Mexico, which the company found through the use of commercial sonar equipment and by processing publicly accessible sonar data.[2] StrikeLines also sold fishing charts and provided free coordinates for public fishing reefs on its website. Griggs and Harper testified that all of the data on StrikeLines' website, including the private reef coordinate data, was collected, compiled, processed, managed, controlled, uploaded, and secured in Pensacola, Florida while the data itself was stored on the website's server in Orlando, Florida.

StrikeLines sold the private coordinates on its website at a price of $190-$199. Harper testified that although the general location of the coordinates was displayed on a map on the StrikeLines website, customers had to actually purchase the coordinates to obtain the exact location of the private reefs. Harper and Griggs further testified that each set of private coordinates was sold only to one customer and never resold.

---

[1] Griggs wholly owned StrikeLines Pensacola, LLC, while Griggs and Harper co-owned StrikeLines Tampa, LLC. Both companies were owned and operated in Pensacola.

[2] Harper testified that StrikeLines found approximately 75% of the private reef coordinates by scanning the Gulf with sonar equipment on its boats. He further testified that StrikeLines discovered the remaining coordinates by processing and "marking up" sonar data created by public entities.

Case No. 3:19cr32-MCR

In May 2018, Alex Fogg[3] contacted StrikeLines and informed the company that an individual named Timothy Smith[4] had obtained StrikeLines' private coordinates after discovering a "vulnerability" in its computer system. On May 14, 2018, Harper contacted Smith to question him about the coordinate data, and Smith confirmed that he had obtained the private coordinates and other private information[5] from the company's website.[6] Smith told Harper that the website had security vulnerabilities, but he did not explain how he was able to access the data. Following the call, Griggs and Harper made the decision to upgrade StrikeLines' website's security.

StrikeLines' web developer, and the person who did the initial security for the website and later the upgrades, was Ralph Haynes. Haynes testified that he initially secured the website's private coordinate data by randomizing the last three to four digits of the coordinates, and then later, after Smith's initial security breach, he encoded the data by converting it into a computer programing language known as

---

[3] Fogg was an acquittance of Griggs and Harper.

[4] Unbeknownst to Griggs and Harper, Smith was a software engineer employed in Mobile, Alabama. At this time, neither Griggs nor Harper knew Smith.

[5] Griggs testified that Smith also obtained customer and sales data.

[6] Smith sent Harper and Griggs screenshots of the data as proof.

Base64.[7] Later on, after another security breach by Smith, Haynes further secured StrikeLines' data, at the company's request, by implementing certain server restrictions on the website.

At trial, evidence was presented showing that Smith told friends, through text and Facebook messages, that he "cracked" into StrikeLines' security and obtained the company's private coordinates. Gov't Exhibit 14H.  In addition, Smith discussed methods for bypassing the website's upgraded security measures with one of his friends. There was also evidence showing that Smith used, or intended to use, StrikeLines' coordinates himself and that he shared the coordinates with multiple friends.[8] *See* Gov't Exhibits 22b, 22c, 22d, 22e, 22h.  Harper and Griggs testified that Smith did not have authority or permission to access StrikeLines' coordinate data at any time.

---

[7] In computer science, "Base64 is an encoding and decoding technique used to convert binary data to an American Standard for Information Interchange (ASCII) text format, and vice versa." *Base64*, TECHOPEDIA, https://www.techopedia.com/definition/27209/base64 (last visited May 26, 2020). It is "generally used to transfer content-based messages over the Internet. It works by dividing every three bits of binary data into six bit units. The newly created data is represented in a 64-radix numeral system and as seven-bit ASCII text. Because each bit is divided into two bits, the converted data is 33 percent, or one-third, larger than the original data. Like binary data, Base64 encoded resultant data is not human readable." *Id.*

[8] There was evidence that Smith was sharing StrikeLines' private coordinates with others as early as May 12, 2018.

In June 2018, StrikeLines' customers contacted Griggs and Harper and informed them that Smith was posting on Facebook that StrikeLines had given him all of its coordinate data.[9] On June 20, 2018, Griggs texted Smith to ask him whether he was still able to access the data. Griggs also asked Smith to stop accessing the data, offering to share the data with others, and posting messages about the company on Facebook. *See* Gov't Exhibit 8. In response, Smith texted that he could still access the data but insisted he was not sharing it.[10] Smith also stated that he would delete the Facebook posts and stop discussing the coordinates with people online if Griggs gave him "deep grouper numbers."[11] Gov't Exhibit 8. He additionally offered to fix StrikeLines' security problem for free as long as it remained "strictly" between Griggs and himself. *Id.* Griggs accepted Smith's offer, agreeing to provide Smith with the deep grouper numbers in exchange for Smith deleting the Facebook posts. The following day, however, Smith texted Griggs back and told him the deal was

---

[9] As noted above, StrikeLines asked Haynes to implement additional security measures on the website around this time.

[10] Instead, Smith maintained that he was only offering to cross-check StrikeLines' coordinates to see if they matched the coordinates of other individuals' privately-placed fishing reefs. *See* Gov't Exhibit 8. However, as noted above, there was evidence that Smith actually shared StrikeLines' coordinates with others.

[11] Specifically, Smith wanted private coordinates for deepwater fishing spots for grouper.

off and that the Facebook posts were going back up. *See id.* Shortly thereafter, Harper and Griggs contacted law enforcement, which led to an investigation.

On November 15, 2018, the FBI interviewed Smith at his residence in Mobile, Alabama, following execution of a search warrant.  At the start of the interview, Smith told the agents he suspected they were there because of StrikeLines. During the interview, Smith admitted to accessing StrikeLines' website; infiltrating the website's security; obtaining the company's private coordinates; and sharing the coordinates with others. He further admitted that he obtained StrikeLines' data through the use of a free web-bugging program called Fiddler, together with a program he created himself.[12]

**Standard of Review**

Rule 29 of the Federal Rules of Criminal Procedure directs a court to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). In reviewing the sufficiency of the evidence, a court is required to view the evidence "in the light most favorable to the government, with all reasonable inferences and credibility choices made in the

---

[12] Fiddler is a free web debugging proxy tool that allows users "to log all HTTP(S) traffic between [their] computer and the Internet." Fiddler, TELERIK,   https://www.telerik.com/fiddler (last visited May 26, 2020). Smith called his self-created program, "Decrypt StrikeLines."

government's favor." *United States v. Barsoum*, 763 F.3d 1321, 1329–30 (11th Cir. 2014) (quoting *United States v. Ortiz,* 318 F.3d 1030, 1036 (11th Cir. 2003)). Viewing the record in this light, this Court must determine whether a reasonable jury could have found Smith guilty beyond a reasonable doubt. *United States v. Mercer*, 541 F.3d 1070, 1074 (11th Cir. 2008) (citing *United States v. Ward*, 197 F.3d 1076, 1079 (11th Cir. 1999)). Courts must uphold a jury verdict if supported by "any reasonable construction of the evidence." *United States v. Rodriguez*, 732 F.3d 1299, 1303 (11th Cir. 2013).

The Federal Rules of Criminal Procedure permit the granting of a new trial when there is newly discovered evidence or the interest of justice requires it. Fed. R. Crim. P. 33. The decision of whether to grant a new trial based on the weight of the evidence is within the sound discretion of the district court. *United States v. Martinez*, 763 F.2d 1297, 1312 (11th Cir. 1985). In reviewing a motion for a new trial based on the weight of the evidence, the court need not view the evidence in light most favorable to the government; instead, "[i]t may weigh the evidence and consider the credibility of the witnesses." *Id*. However, "the court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." *Id.* at 1312-13. Indeed, "[t]he evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the

verdict stand." *Id.* at 1313. Notably, motions for new trials based on the weight of the evidence are disfavored and should only be granted sparingly in exceptional cases. *Id.*

## Discussion

### I.   Judgment of Acquittal – Theft of Trade Secrets

#### a.  Venue

Smith first argues that the Government failed to present sufficient evidence to establish venue on the charge of theft of trade secrets. A criminal defendant has a constitutional and statutory right to be tried in the district where his crimes were committed. U.S. Const. art. III, § 2, cl. 3 ("The Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed."); U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed."); *see* Fed. R. Crim. P. 18 ("[T]he government must prosecute an offense in a district where the offense was committed."). In a criminal case, "the *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *United States v. Cabrales*, 524 U.S. 1, 6–7 (1998); *see also Locus Delicti*, Black's Law Dictionary (11th ed. 2019) (defining "*locus delicti*" as "[t]he place where an offense is committed."). Specifically, to determine

the *locus delicti* of a crime, the "court must initially identify the conduct constituting the offense (the nature of the crime) and then discern the location of the commission of the criminal acts." *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279 (1999). This requires the court to determine the "essential conduct elements" of the crime from the language of the statute. *See id.* at 281: *see also United States v. John*, 477 F. App'x 570, 570–571 (11th Cir. 2012).

Smith argues venue was not proper in the Northern District of Florida because the essential conduct elements for the crime of theft of trade secrets under Count Two occurred either in the Southern District of Alabama, more specifically, Mobile, Alabama, where he allegedly received StrikeLines' data, or in the Middle District of Florida, more specifically, Orlando, Florida, where the server holding the data was physically located. The Government argues venue was proper in this district, where StrikeLines was located and the effects of the crime were felt.

Several courts have recognized that, under certain circumstances, venue may lie within the district where the effects of the criminal conduct are felt. *See, e.g., United States v. Bowens,* 224 F.3d 302, 311 (4th Cir. 2000); *see also United States v. Muench,* 153 F.3d 1298, 1301 (11th Cir. 1998) ("The place that suffers the effects of a crime deserves consideration for venue purposes."). For example, courts have found venue proper in the district where the effects of criminal conduct were felt in

prosecutions for failure to pay child support, *see, e.g., Muench*, 153 F.3d at 1301–04 (holding that venue was proper under the Child Support Recovery Act, 18 U.S.C. § 228, in the district where the children resided),[13] obstruction of justice, *see, e.g.*, *United States v. Barham*, 666 F.2d 521, 524 (11th Cir. 1982) (holding that venue under 18 U.S.C. § 1503[14] was proper in the district where the court affected by the obstructive acts was located),[15] and Hobbs Act robbery, *see United States v. Davis*, 689 F.3d 179, 187 (2d Cir. 2012) ("[V]enue for a substantive Hobbs Act charge is proper in any district where interstate commerce is affected or where the alleged acts took place.") (citations and quotations omitted). Specifically, venue may lie where the effects of criminal conduct are felt "when an essential conduct element is itself defined in terms of its effects." *Bowens*, 224 F.3d at 311, 313 ("When Congress defines the essential conduct elements of a crime in terms of their particular effects,

---

[13] Congress has since amended the Child Support Recovery Act ("CSRA") to include a venue provision, *see* Deadbeat Parents Punishment Act of 1998, Pub. L. No. 105–187, 112 Stat. 618 (1998), which is now codified at 18 U.S.C. § 228(e). *See Muench*, 153 F.3d 1298, 1303 n.1 ("While this appeal was pending, Congress clarified its intent that a prosecution under the CSRA can be brought in the district where the child resides.").

[14] In 1988, Congress amended 18 U.S.C. § 1512 to include a specific venue provision for § 1503 and § 1512 offenses, *see* Anti–Drug Abuse Act of 1988, PL 100–690 (HR 5210), 102 Stat 4181 (1988), which is now codified at 18 U.S.C. § 1512(i).

[15] *But see United States v. Swann*, 441 F.2d 1053, 1055 (D.C. Cir. 1971) (holding that venue in prosecution for intimidating or influencing a witness under § 1503 was only proper where the influencing acts occurred, not in the district where the witness was set to testify).

venue will be proper where those proscribed effects are felt."); *see also United States v. Auernheimer*, 748 F.3d 525, 537 (3d Cir. 2014).

To establish a violation of 18 U.S.C. § 1832(a)(1), the government must prove "(1) that the defendant intended to convert proprietary information to the economic benefit of anyone other than the owner; (2) that the proprietary information was a trade secret; (3) that the defendant knowingly stole [or appropriated, took, or carried away without authorization] trade secret information; (4) that the defendant intended or knew the offense would injure the owner of the trade secret; and (5) that the trade secret was included in a product that is placed in interstate commerce."[16] *See United States v. Wen Chyu Liu*, 716 F.3d 159, 169–70 (5th Cir. 2013) (citing 18 U.S.C. § 1832). The essential conduct at issue then is the act of knowingly stealing a trade secret or appropriating, taking, or carrying away a trade secret without authorization.[17] Necessarily embedded in this conduct is the act of taking the trade secret from its rightful owner. Indeed, there can be no act of theft or misappropriation

---

[16] 18 U.S.C. § 1832(a)(1) specifically provides: "Whoever, with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly-- (1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information . . . shall, except as provided in subsection (b), be fined under this title or imprisoned not more than 10 years, or both."

[17] While not relevant here, 18 U.S.C. § 1832(a)(1) also prohibits the acts of concealing a trade secret or obtaining a trade secret by fraud, artifice, or deception.

without another's loss of property. *See* 18 U.S.C. § 1839(5)(A) (defining

"misappropriation" under the statute as the "acquisition of a *trade secret of another*

by a person who knows or has reason to know that the trade secret was acquired by

improper means.") (emphasis added); *see also Theft*, Black's Law Dictionary (11th

ed. 2019) (defining "theft" as "[t]he wrongful taking and removing of *another's*

*personal property* with the intent of depriving the true owner of it.") (emphasis). In

other words, the essential conduct of theft or misappropriation is necessarily defined

in terms of its effects, i.e., the owner's loss of the trade secret. *See Bowens*, 224 F.3d

at 313. The fact that Congress did not explicitly define "stealing" or "theft" within

the statute does not alter this conclusion. Where, as here, the terms Congress failed

to explicitly define have a clear and common ordinary meaning, the Court finds it

appropriate to consider that meaning in its venue analysis. *See Konikov v. Orange*

*Cty., Fla.*, 410 F.3d 1317, 1329 (11th Cir. 2005) ("Where a statute does not define a

term, we must give words their common and ordinary meaning, absent some

established technical definition, unless the legislature intended otherwise."

Accordingly, venue is proper under § 1832(a)(1) in the place where the owner of the

trade secret is located and feels the loss of its trade secret.[18]  *See Bowens,* 224 F.3d at 313; *see also Muench*, 153 F.3d at 1301.

Here, it is undisputed that StrikeLines owned the trade secret at issue, i.e., the private fishing coordinate data, and that StrikeLines resided in the Northern District of Florida when the trade secret was stolen. Further, the evidence at trial was sufficient to establish that Smith targeted StrikeLines and its website and thereby stole or misappropriated StikeLines' private coordinate data, causing a loss to the company in this district. Under these circumstances, the Court finds venue proper.

### b.  Sufficiency of the Evidence

Smith also moves for a Judgment of Acquittal on the theft of trade secrets charge on grounds that the Government failed to present sufficient evidence of each element of § 1832(a)(1). ECF No. 82 at 6–9. The Court disagrees.

---

[18] In the civil context, it is generally recognized that intellectual property, such as a trade secret, resides with the property's owner. *See Horne v. Adolph Coors Co.*, 684 F.2d 255, 259 (3d Cir. 1982) ("[I]nsofar as the situs of the property damaged by the alleged wrongdoing is a concern, both a state trade secret and a patent should be deemed to have their fictional situs at the residence of the owner."); *SMA Med. Labs. v. Advanced Clinical Lab. Sols., Inc.*, No. CV 17-3777, 2018 WL 3388325, at *3 (E.D. Pa. July 12, 2018) (determining that the trade secrets at issue had their "fictional situs" in the district where the owner was located for purposes of determining personal jurisdiction and venue); *see also Geodetic Servs., Inc. v. Zhenghzou Sunward Tech. Co.*, No. 8:13-CV-1595-T-35TBM, 2014 WL 12620804, at *3 (M.D. Fla. Apr. 4, 2014) (recognizing that the situs of the injury in trade secret misappropriation and copyright infringement case was in the state where the owner of the intelligential property resided); *cf. GP Credit Co., LLC v. Orlando Residence, Ltd.*, 349 F.3d 976, 979 (7th Cir. 2003) ("The general rule is that intangible personal property is 'located' in its owner's domicile."). Applying this principle here, Smith's act of theft unquestionably would have been committed in this district.

Smith first argues there was insufficient evidence of his intent to convert a trade secret to the benefit of someone other than StrikeLines, *see* 18 U.S.C. § 1832(a)(1). Specifically, he argues the evidence showed that he did not intend to share or distribute StrikeLines' coordinates but rather only intended to cross-check the coordinates to see if they matched the coordinates of other individuals' privately-placed fishing reefs. *See* ECF No. 82 at 7. However, as the Government correctly notes, there was evidence showing that Smith used, or intended to use, StrikeLines' fishing coordinates himself and that he gave the coordinates to multiple friends. *See* Gov't Exhibits 22b, 22c, 22d, 22e, 22h.

Smith also argues there was insufficient evidence establishing that StrikeLines' fishing coordinates constituted a trade secret. *See Wen Chyu Liu*, 716 F.3d at 169.  In relevant part, the Economic Espionage Act defines the term "trade secret" as:

> . . . all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if--
>> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily

> ascertainable through proper means by, another person who can obtain
> economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3).

The Court rejects Smith's argument that there was insufficient evidence showing that StrikeLines' took reasonable measures to protect the coordinate data. *See* 18 U.S.C. 1839(3)(A). StrikeLines hired Haynes, a web developer, to secure the data. Haynes secured the data– through encoding, randomization, and other methods– and updated StrikeLines' web security on multiple occasions at StrikeLines' request. Notably, Smith himself admitted, in text messages to Griggs, that the security measures put in place would "deter 99.9% of users" from accessing the company's data. Gov't Exhibit 8. Additionally, in Facebook messages, Smith discussed methods for accessing the information after additional security measures were put in place and he acknowledged that he had to "crack" the website's security. Gov't Exhibit 14H ("[H]e changed the security recently but I cracked it in about 5 min."); *id.* ("I want to figure out his latest randomization but I haven't had time.").

The Court also rejects Smith's argument that the data did not constitute a trade secret because the information was readily ascertainable, *see* 18 U.S.C. 1839(3)(B), as "the vast majority, [i]f not all the coordinates [StrikeLines] sell[s] are publicly available." ECF No. 82 at 7. Smith's argument assumes that StrikeLines' private

coordinates relate to reefs placed in the Gulf by private parties, which were required to be permitted and whose locations were published on public databases. The evidence at trial, however, showed that a substantial majority of the reef coordinates StrikeLines sold were located through the use of sonar equipment on the company's boats[19] and that many of the reefs in the Gulf were either naturally occurring or had been placed by private parties without permits.[20] Viewing this evidence in the light most favorable to the Government, a reasonable jury could infer that the reefs StrikeLines found with its sonar equipment were not publicly listed, permitted reefs.[21] Furthermore, although Smith argues that StrikeLines' private coordinates were publicly available, he, himself, referred to the coordinates as being associated with "private" fishing spots. *See* Gov't Exhibit 22H ("You interested in all of the strikeline numbers including all the private spots he has for sell [sic] and all the ones he has sold?"); Gov't Exhibit 14L ("Roughly 1800 are private."). Moreover, a

---

[19] Harper testified that approximately 75% of the coordinates StrikeLines sold were found using sonar equipment and the remaining 25% were found by processing and analyzing public sonar data. While not at issue in this case, StrikeLines also posted coordinates for public reefs for free on its website.

[20] Griggs testified that some reefs were created by shipwrecks and a substantial number were placed by private parties without a permit.

[21] While Smith does not make a specific argument on this point, a reasonable jury could find that StrikeLines' remaining private coordinates were not readily ascertainable because there was evidence that StrikeLines had to process and analyze raw public sonar data to obtain these coordinates.

reasonable jury could infer, from Smith's discussions with his friends about the value of StrikeLines' private coordinates, that these coordinates were not generally known or readily ascertainable.[22] *See* Gov't Exhibit 22g ("These strikeline numbers are legit"); *id.* ("The shelf and pipeline mapping's [sic] are the most impressive"); Gov't Exhibit 22b (noting that the StrikeLines coordinates Smith sent him were remarkable).

Smith also argues that the jury could not have found that Smith *stole or misappropriated* StrikeLines' trade secret, *see* 18 U.S.C. § 1832(a)(1), because this would be inconsistent with the jury's acquittal on the computer fraud charge in Count One. *See* ECF No. 82. The Court easily dismisses this argument. Even assuming *en arguendo* that the jury's verdicts were inconsistent,[23] an inconsistency, standing alone, would not be grounds to reject the jury's guilty verdict on Count Two. *See United States v. Mitchell*, 146 F.3d 1338, 1345 (11th Cir. 1998) ("[A]s

---

[22] Smith's argument that StrikeLines' private coordinates were all available on public databases for permitted reefs is undermined by the fact he and his friends, who all fished in the Gulf, were impressed by the coordinates and eager to fish the spots. A reasonable jury could infer that Smith, who had experience locating reef coordinates himself, would not have been so enthusiastic about sharing these coordinates with friends and fishing them had they otherwise been publicly available.

[23] The Court notes that the jury's verdicts on Counts One and Two are not necessarily inconsistent because the crimes charged have different elements and the jury had to separately assess venue for each count.

long as the guilty verdict is supported by sufficient evidence, it must stand, even in the face of an inconsistent verdict on another count.").[24]

Lastly, Smith argues there was insufficient evidence to show that he intended to harm StrikeLines. *See* 18 U.S.C. § 1832(a)(1); *Wen Chyu Liu*, 716 F.3d at 169. The Court disagrees. There was sufficient evidence from which the jury could have found that Smith intended to harm StrikeLines, including texts/Facebook messages in which Smith boasted about accessing StrikeLines' coordinates, *see* Gov't Exhibit 22c ("I've got all his shit shhhh . . . . Thousands of spots") and offered the coordinates, which he knew StrikeLines had for sale or had already sold, to his friends for free. *See* Gov't Exhibit 22h. Smith's Motion for Judgment of Acquittal as to Count Two is due to be denied.

### c.  Motion for New Trial Based on the Weight of the Evidence

Alternatively, Smith moves for a new trial on the theft of trade secrets charge based on the weight of the evidence, arguing that the "Government's proof failed as a matter of law to prove the elements necessary to convict [him] on Count[] Two."[25] ECF No. 82 at 17. The Court disagrees for the reasons discussed above.

---

[24] The Court finds that there was more than sufficient evidence from which a reasonable jury could find that Smith stole or misappropriated StrikeLines' data.

[25] Smith essentially relies on the same arguments raised in support of his Motion for Judgment of Acquittal to support his motion for a new trial. *See* ECF No. 82.

## II.   Extortion

Smith has also renewed his Motion for Judgment of Acquittal, and has alternatively moved for a new trial, on the extortion charge in Count Three, arguing lack of venue[26] and insufficiency of the evidence. The same as with Count Two, the motions are due to be denied.

### a.  Judgment of Acquittal Based on Sufficiency of the Evidence

To establish a violation of 18 U.S.C. § 875(d), the Government was required to prove that 1) Smith knowingly sent a message containing a true threat[27] to damage the property or reputation of another; 2) that he did so with intent to extort a thing of value; 3) and that the threat was sent in interstate or foreign commerce or through a facility of interstate or foreign commerce. *See* 18 U.S.C. § 875(d).[28]

---

[26] As previously discussed at trial, Smith's venue argument lacks merit. *See* ECF No. 82 at 9–10. While Smith is correct that venue must be proper as to each count where a defendant is charged with multiple counts, *see United States v. Schlei*, 122 F.3d 944, 979 (11th Cir. 1997) ("Venue must exist for each offense charged."); *United States v. Davis*, 666 F.2d 195, 198 (5th Cir. Unit B. 1982) ("Venue may properly be laid in one district with respect to one count of an indictment, but still be improper with respect to the other counts."), this does not support "the facially illogical position that proper venue as to one count is destroyed by improper venue as to another." *United States v. Ayo*, 801 F. Supp. 2d 1323, 1332 (S.D. Ala. 2011) (rejecting similar argument).

[27] "A 'true threat' is a serious threat – not idle talk, a careless remark or something said jokingly – that is made under circumstances that would place a reasonable person in fear of damage to their property or reputation." ECF No. 73 at 18.

[28] 18 U.S.C. § 875(d) specifically provides: "Whoever, with intent to extort from any person, firm, association, or corporation, any money or other thing of value, transmits in interstate

The trial evidence showed that Smith engaged in conduct online that was damaging to StrikeLines' business, i.e., telling people on Facebook that StrikeLines gave him its master list of private coordinates and sharing, and offering to share, the coordinates with others. Griggs testified that Smith's actions harmed StrikeLines' reputation and credibility because the company's business model depended on the private coordinates being known only to the person who purchased them. Furthermore, a reasonable jury could infer, from the evidence showing that Smith used these coordinates himself and shared them with others for free, that Smith's actions harmed the value of StrikeLines' property, i.e., the private coordinate data. Notably, after Griggs informed Smith that this conduct was harming the business, Smith told Griggs that he would only stop if Griggs gave him "deep grouper numbers." Gov't Exhibit 8. Viewing this evidence cumulatively and in the light most favorable to the Government, a reasonable jury could find that this constituted a true threat to damage, or continue damaging, the property and/or reputation of StrikeLines and that Smith communicated this threat with intent to procure a thing of value, i.e., the deep grouper numbers.[29] *See* ECF No. 73 at 19 ("To act with 'intent

---

or foreign commerce any communication containing any threat to injure the property or reputation of the addressee . . . shall be fined under this title or imprisoned not more than two years, or both."

[29] In light of the evidence showing that StrikeLines' private fishing coordinates sold for $190-$199 combined with the nature of Smith's discussions with Griggs and his friends regarding

to extort' means to act with the purpose of obtaining money or something of value from someone who consents because of the true threat."); *see also  United States v. Killen*, 729 F. App'x 703, 711 (11th Cir.), *cert. denied*, 139 S. Ct. 611 (2018) (to establish that the defendant had intent to extort, "the government must prove that the defendant had the intent to procure something of value through wrongful conduct.") (citations omitted).[30]

### b.  Motion for New Trial Based on the Weight of the Evidence

Taking into account the evidence and testimony presented at trial, the Court rejects Smith's argument that the evidence heavily preponderates against the jury's guilty verdict on Count Three. *See Martinez*, 763 F.2d at 1313. Indeed, this is not one of those exceptional cases where the evidence weighs so heavily against the jury verdict that a miscarriage of justice would result if it were not set aside. *Id.*

---

the "deep grouper numbers" and StrikeLines' other coordinates, the Court finds there was sufficient evidence to establish that "deep grouper numbers" constituted a "thing of value." *See United States v. Nilsen*, 967 F.2d 539, 543 (11th Cir. 1992) (broadly interpreting the term "thing of value" to include, not just tangible objects with monetary value, but also intangible considerations, whose value can be established from the conduct and expectations of the defendant and the target of the extortionate threat).

[30] Smith's arguments that his Facebook posts do not constitute true threats directed at StrikeLines are misplaced. *See* ECF No. 82. As discussed, Smith *sent texts directly to StrikeLines' owner* containing threats to continue engaging in conduct that was harming StrikeLines' reputation and/or property.

Accordingly, Smith's Post-Verdict Motion for Judgment of Acquittal and, in the Alternative, Motion for New Trial, ECF No. 82, is **DENIED**.

**DONE AND ORDERED** this 22nd day of June, 2020.

*s/ M. Casey Rodgers*

**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**